REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  DOUGLAS J. ROVENS (SBN 106582)
2  ROVENS LAMB LLP
   drovens@rovenslamb.com
3  2601 Airport Drive, Suite 370
   Torrance, California 90505
4  Telephone: (310) 536.7830
   Facsimile: (310) 872.5026
5
6  JAMES P. BONNER – ADMITTED PRO HAC VICE
   PATRICK L. ROCCO – ADMITTED PRO HAC VICE
7  SUSAN M. DAVIES – ADMITTED PRO HAC VICE
   FLEISCHMAN BONNER & ROCCO LLP
8  81 Main Street, Suite 515
   White Plains, New York 10601
9  Telephone: (908) 516.2066

10 Attorneys for Petitioners
   EMMA JEAN ANDERSON, et al.

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                   WESTERN DIVISION

14 EMMA JEAN ANDERSON, *et al*.,        Case No. 2:22-CV-2160 PA (ASx)
15              Petitioners,
                                        **PETITIONERS' POST HEARING**
16 v.                                   **MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES RE: OAKTREE**
17 ISLAMIC REPUBLIC OF IRAN and         **CAPITAL MANAGEMENT LP'S**
   NATIONAL IRANIAN OIL                 **CONTROL OVER THE IRANIAN**
18 CORPORATION,                         **OIL ABOARD ITS VESSEL THE**
                                        **SUEZ RAJAN**
19              Respondents.
20
21                                      [Filed concurrently with Compendium of
                                        Transcript and Selected Exhibits from
22                                      Nov. 17, 2022 Hearing Examination;
                                        Petitioners' Application to File Under
23                                      Seal Pursuant to Local Rule 79-5.2.2(b)]
24
25                                      Judge:          Hon. Alka Sagar
                                        Courtroom:      540
26                                      Hearing Date:   November 17, 2022
27
28

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

THE RELEVANT FACTS ......................................................................... 4

A. Petitioners' Judgments Against Iran ................................................. 4

B. Iran's Efforts to Evade U.S. Sanctions Applicable
   to the Smuggled Oil Aboard the Tanker Suez Rajan ............................... 5

C. Oaktree and Its Control of the Suez Rajan ............................................ 8

I. THE COURT HAS SUBJECT MATTER JURISDICTION
   OVER THESE POST-JUDGMENT PROCEEDINGS ................................... 13

II. FEDERAL RULE OF CIVIL PROCEDURE 69 PERMITS
    JUDGMENT CREDITORS TO RELY ON FEDERAL LAW
    AND STATE (CALIFORNIA) LAW PROCEDURAL MECHANISMS
    TO FACILITATE THEIR COLLECTION EFFORTS ................................... 14

III. THE COURT SHOULD EXERCISE ITS AMPLE
     STATUTORY AND EQUITABLE POWERS TO FACILITATE
     PETITIONERS' ABILITY TO EXECUTE THEIR DEFAULT
     JUDGMENTS AGAINST THE SMUGGLED OIL .................................... 14

A. The Court May Exercise Its Full Array of Equitable
   Powers in Connection with the Examination Hearing ............................ 14

B. TRIA and the FSIA Dictate that the Smuggled Oil
   Enjoys No Immunity from Execution ...................................................... 15

C. At the Examination Hearing Petitioners Demonstrated
   that They Satisfy All of TRIA's Requirements for
   Executing Against the Proceeds of the Smuggled Oil ........................... 19

   1. The Elements Petitioners Must Prove to Show Their
      Entitlement to Collect the Smuggled Oil Under TRIA ..................... 19

   2. Petitioners Hold Judgments Against Iran, a Terrorist Party .............. 20

   3. Petitioners' Judgments Arise from Claims for
      Which Iran Has No Immunity from Liability .................................... 20

   4. Petitioners' Uncollected Compensatory Damages
      Far Exceed the Value of the Smuggled Oil ...................................... 21

ROVENS LAMB LLP
TRIAL LAWYERS

i

5.  The Smuggled Oil is a Blocked Asset of NIOC,
Which Qualifies as an Agency or Instrumentality
of Iran Under TRIA..................................................................21

D. The Presence of the Smuggled Oil in International
Waters Does Not Prevent the Court from Ordering
Oaktree to Take the Steps Necessary to Facilitate
Petitioners' Ability to Execute Against Those Assets ............................23

IV.    CONCLUSION ...................................................................................28

ROVENS LAMB LLP
TRIAL LAWYERS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETITIONERS' POST-HEARING MEMORANDUM OF POINTS AND AUTHORITIES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1

<u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Aequitas Enters., LLC v. Interstate Inv. Grp., LLC*
    (Utah 2011) 267 P.3d 923 ................................................................... 24

4

5

*Bennett v. Islamic Republic of Iran*,
    (9th Cir. 2015) 817 F.3d 1131 ........................................................... 20

6

*Branch v. Umphenour,*
    (E.D. Cal. Jan 18, 2017) 2017 U.S. Dist. LEXIS 7032 ...................... 26

7

8

*Brown v. Brown*,
    (1971) 22 Cal. App. 3d 82 ................................................................. 23

9

*Cisneros v. Alpine Ridge Grp.*,
    (1993) 508 U.S. 10 ............................................................................. 17

10

11

*Commonwealth of the N. Mariana Islands v.*
    *Candian Imperial Bank of Commerce*
    (N.Y. 2013) 990 N.E.2d 114 ............................................................. 17

12

13

*Estate of Hardwick v. Islamic Republic of Iran*,
    (D.D.C. Oct. 1, 2021) 2021 U.S. Dist. LEXIS 252934 ...................... 21

14

15

*Glob. Money Mgmt. v. McDonnold*,
    (S.D. Cal. Oct. 15, 2009) 2009 U.S. Dist. LEXIS 96067 ................... 24

16

17

*Goodyear Atomic Corp. v. Miller*,
    (1988) 486 U.S. 174 ........................................................................... 25

18

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venez.*
    (D.D.C. 2016) 185 F. Supp. 3d 233 .................................................. 19

19

20

*Groza-Vance v. Vance*,
    (Ohio Ct. App. 2005) 834 N.E.2d 15 ................................................. 24

21

*Imperial Bank v. Pim Elec., Inc.*,
    (1995) 33 Cal. App. 4th 540 .............................................................. 14

22

23

*JW Oilfield Equip., LLC v. Commerzbank AG*,
    (S.D.N.Y. 2011) 764 F. Supp. 2d 587 ............................................... 24

24

*Koehler v. Bank of Bermuda Ltd.*,
    (N.Y. 2009) 883 N.Y.S.2d 763 ..................................................... 24, 25

25

26

*Levin v. Bank of N.Y.*,
    (S.D.N.Y. Jan. 28, 2011) 2011 U.S. Dist. LEXIS 8946 ..................... 16

27

28

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Levin v. Bank of N.Y.*,
(S.D.N.Y. Oct. 3, 2019) 2019 U.S. Dist. LEXIS 237101 ................................. 25

*Miller v. Doniger*,
(N.Y. App. Div. 2006) 814 N.Y.S.2d 141 .............................................. 25, 26

*Peacock v. Thomas*,
(1996) 516 U.S. 349 ....................................................................... 14

*Peterson v. Islamic Republic of Iran*,
(9th Cir. 2010) 627 F.3d 1117 ............................................................ 13

*Ramirez v Manpower, Inc.*
(N.D. Cal. July 10, 2014) 2014 U.S. Dist. LEXIS 94362 .............................. 26

*Republic of Arg. v. NML Capital, Ltd.*,
(2014) 573 U.S. 134 ....................................................................... 15

*Rubin v. Islamic Republic of Iran*,
(D. Mass. Sept. 30, 2006) 2006 U.S. Dist. LEXIS 73383 ............................. 13

*Samantar v. Yousuf*,
(2010) 560 U.S. 305 ....................................................................... 15

*Stansell v. Revolutionary Armed Forces of Colombia*,
(11th Cir. 2014) 771 F.3d 713 .......................................................... 16

*Taylor v. Taylor*,
(1923) 192 Cal. 71 ....................................................................... 23

*UMG Recordings, Inc. v. BCD Music Grp., Inc.*,
(C.D. Cal. Jul. 9, 2009) 2009 U.S. Dist. LEXIS 97017 ............................. 24, 25

*United States v. Int'l Union of Petrol. & Indus. Workers*
(9th Cir. 1989) 870 F.2d 1450 .......................................................... 18

*Weininger v. Castro*,
(S.D.N.Y. 2006) 462 F. Supp. 2d 457 .................................................. 19

**Statutes**

Cal. Civ. Proc. Code § 708.120 ................................................ 14, 15, 18

Cal. Civ. Proc. Code § 708.205 ................................................ 14, 15, 18

Cal. Civ. Proc. Code § 708.620 ...................................................... 15

N.Y. CPLR § 5225(b) .............................................................. 17, 18

Export Administration Act of 1979,
50 U.S.C. § 4604 ................................................................... 18, 20

ROVENS LAMB LLP
TRIAL LAWYERS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETITIONERS' POST-HEARING MEMORANDUM OF POINTS AND AUTHORITIES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Foreign Assistance Act of 1961 § 620A
   22 U.S.C. § 2371....................................................................... 20

Foreign Sovereign Immunities Act,
   28 U.S.C. § 1602 *et seq*. ................................................*passim*

International Emergency Economic Powers Act,
   50 U.S.C. §§ 1701, 1702 ......................................................... 21

Terrorism Risk Insurance Act of 2002 ("TRIA") § 201(a),
   28 U.S.C. § 1610 (note) ....................................................*passim*

Trading with the Enemy Act, § 5(b),
   50 U.S.C. § 4305(b).................................................................. 21

28 U.S.C. § 1603(b) ...................................................................... 21

28 U.S.C. § 1605(a)(3) ................................................................. 19

28 U.S.C. § 1605(a)(7) ..................................................... 16, 19, 20

28 U.S.C. § 1605A .......................................................... 16, 20,

28 U.S.C. § 1608............................................................................ 5

28 U.S.C. § 1609 ................................................................... 15, 16

28 U.S.C. § 1610 ................................................................... 15, 16

28 U.S.C. § 1611 ......................................................................... 15

28 U.S.C. § 1963............................................................... 5, 13

**Rules**

31 C.F.R. § 501.603(a)(2)............................................................ 25

Fed. R. Civ. P. 34 ........................................................................ 18

Fed. R. Civ. P. 69 ............................................................. 1, 13, 14

Fed. R. Evid. 602 ........................................................................ 26

Fed. R. Evid. 801(c).................................................................... 26

**Other Authorities**

Alan M. Ahart, *California Practice Guide: Enforcing Judgments & Debts,*
   Ch. 6J-3 (2021 Update) .....................................................23, 24

Alan M. Ahart, *California Practice Guide: Enforcing Judgments & Debts*
   (The Rutter Group 1994) .......................................................... 15

Executive Order 13224

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

66 Fed. Reg. 49079 (Sept. 25, 2001) .................................................................. 25

Executive Order 13599
77 Fed. Reg. 6657 (Feb. 5, 2012) ............................................................. 21, 22

ROVENS LAMB LLP
TRIAL LAWYERS

vi

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## INTRODUCTION

Petitioners are victims of terrorist attacks sponsored by the Islamic Republic of Iran ("Iran").  The majority of Petitioners are victims of the 1983 terrorist bombing the U.S. Marine Barracks in Beirut, Lebanon that was carried out by Iran's proxy, the terrorist organization Hezbollah.  That attack, which involved what was until then the largest non-nuclear weapon explosion in the Earth's history, killed 241 American servicemen and injured many others.  Petitioners also include personal representatives and family members of: (a) a 14-year-old boy killed in a 1997 Iranian-sponsored terrorist bombing in Israel; (b) two American soldiers who were kidnapped and murdered by Iranian-sponsored terrorists in Iraq; and (c) a 15-year-old girl killed in the infamous 2001 Sbarro Restaurant bombing in Jerusalem perpetrated by the Iranian-backed Hamas terrorist organization.  Collectively, Petitioners hold billions of dollars of uncollected default judgments (the "Default Judgments") against Iran for compensatory damages.

With limited success, Petitioners have diligently sought for decades to collect those judgments.  Iran, however, is well-practiced in the art of evading judgments.

In this proceeding, Petitioners rely on Section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA") and judgment enforcement procedures available under California law (as Fed. R. Civ. P. 69 contemplates) to collect the proceeds of the sale of certain crude oil owned by the National Iranian Oil Corporation ("NIOC").  NIOC is wholly owned by Iran.  That oil (the "Smuggled Oil") is currently located on the Marshall Islands-flagged crude oil tanker Suez Rajan, a vessel controlled by Oaktree Capital Management, LP ("Oaktree"), an investment firm headquartered in this District.  NIOC attempted to secretly load the Smuggled Oil aboard the Suez Rajan and ship it to Chinese buyers in an effort to evade the sanctions that the U.S. government has imposed on Iran as a result of its nuclear

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  proliferation efforts and longtime sponsorship of terrorist attacks against

2  American citizens.

3        Because of the persistent and successful judgment evasion efforts of U.S.

4  government-designated state sponsors of terrorism, particularly Iran, Congress

5  enacted TRIA.  That statute dictates that the agencies and instrumentalities of

6  terrorist states, like NIOC, bear full liability for terrorism-related judgments

7  entered against their sovereigns.  Thus, the fact that the Smuggled Oil belongs to

8  NIOC, not Iran, poses no obstacle to Petitioners' efforts to use that oil to satisfy

9  their Default Judgments.

10        The presence of the Smuggled Oil in international waters also does not

11  deprive the Court of the power to order Oaktree to take the steps necessary to

12  facilitate Petitioners' ability to execute their judgments against that cargo.  Well-

13  established precedent dictates that courts may order third parties subject to the

14  courts' jurisdiction to take steps necessary to facilitate the collection of judgment

15  debtors' assets that are controlled by third parties, even when the assets are located

16  in foreign states or countries.  For example, courts have exercised their broad

17  equitable powers to facilitate judgment collection by ordering third parties to bring

18  assets over which they have control into the jurisdiction, requiring third parties to

19  assign their rights in foreign assets to judgment creditors, and appointing receivers

20  to sell judgment debtor assets located in other jurisdictions.  Thus, the Court may

21  exercise all of those powers—and more—to facilitate the collection of Petitioners'

22  Default Judgments.

23        As the initial step in these judgment enforcement proceedings, the Court

24  granted Petitioners the right to conduct a two-hour examination of Oaktree at a

25  hearing on November 17, 2022 (the "Examination Hearing").  The Court limited

26

27

28

**ROVENS LAMB LLP**
**TRIAL LAWYERS**

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  that hearing solely to the issue of "whether Oaktree has possession or control of
2  the crude oil on the Suez Rajan." Tr. at 6.[1]

3       As shown below, evidence introduced at the Examination Hearing
4  demonstrates that Oaktree is the ultimate owner of the Suez Rajan through a series
5  of affiliated foreign shell companies. Moreover, under the Bareboat Charter
6  Agreement governing the Suez Rajan, Oaktree has the right and ability to re-take
7  possession of the vessel and its cargo.

8       Although the Court has yet to grant Petitioner a hearing or discovery on the
9  separate issue of whether Iran's NIOC owns the Smuggled Oil aboard the Suez
10 Rajan, a wealth of circumstantial evidence demonstrates that no credible question
11 exists regarding that fact. Indeed, since Oaktree's connection to the Smuggled Oil
12 was first revealed publicly in February 2022, the Suez Rajan has merely idled in
13 international waters for more than nine months, rather than proceeding to her
14 Chinese destination. That unusual conduct confirms that the Smuggled Oil
15 belongs to NIOC. Otherwise, the owner of that $100 million cargo would have
16 stepped forward in the past nine months to claim its property.

17      Moreover, the Bareboat Charter Agreement that Oaktree originally cited as
18 evidence that it cannot control the Suez Rajan actually compels the opposite
19 conclusion. The Bareboat Charter entitles Oaktree to reclaim the Suez Rajan if the
20 charterer, Suez Rajan, Limited, an affiliate of Empire Navigation Inc. ("Empire
21 Navigation") allows the vessel to be used in a manner that violates U.S. sanctions
22 against Iran. All parties, ███████████████ agree that Empire Navigation
23 has violated those terms of the Bareboat Charter. ████████████
24 ████████████████████████████████████████████

25
26
27 _____
   [1] Citations to "Tr. at __" refer to specific pages of the Transcript of the November 17, 2022
   Examination Hearing which is attached at Tab 1 of the Compendium of Transcript and Selected
28 Exhibits from November 17, 2022 Examination Hearing ("Compendium").

ROVENS LAMB LLP
TRIAL LAWYERS



9   Oaktree                                                    believes Empire

10  Navigation has violated the Bareboat Charter's sanctions provisions and that those

11  violations entitle Oaktree to reclaim the Suez Rajan.

12      Thus, Petitioners have established all of the facts that entitle them to an

13  order requiring Oaktree to take the steps necessary to facilitate Petitioners' ability

14  to collect the Smuggled Oil.  Specifically, Oaktree has the ability to control the

15  Smuggled Oil, an asset of an Iranian agency subject to collection under TRIA.

16  The Court should therefore order Oaktree to commence the steps necessary to

17  reclaim the Suez Rajan and to bring its Iranian-owned cargo to U.S. waters.

## The Relevant Facts

### A.   Petitioners' Judgments Against Iran

20      As noted above, most Petitioners are American military service members

21  injured in the infamous 1983 Iranian-sponsored attack upon the Marine Barracks

22  in Beirut, Lebanon, the personal representatives of service members killed in the

23  attack, and family members of those individuals.  *See* May 13, 2022 Declaration

24  of James P. Bonner [Dkt. 22-4] ("Bonner Decl.") at ¶ 3.   Petitioners also include

25  personal representatives and family members of: (a) a 14-year-old boy killed in a

26  1997 Iranian-sponsored terrorist bombing in Israel; (b) two American soldiers who

27  were kidnapped and murdered by Iranian-sponsored terrorists in Iraq; and (c) a 15-

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    year-old girl killed in the 2001 Sbarro Restaurant bombing in Jerusalem

2    perpetrated by the Iranian-backed Hamas terrorist organization.  *Id.*  Petitioners'

3    unsatisfied Default Judgments against Iran total more than $4.9 billion, including

4    post-judgment interest.  *Id.* at ¶ 4.

5            Petitioners' Default Judgments arose from claims asserted pursuant to the

6    statutory exceptions to sovereign immunity that are applicable to terrorism-related

7    claims under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et*

8    *seq.*  Bonner Decl. at ¶¶ 5-6.  Those Default Judgments were issued in 16 separate

9    actions by the U.S. District Court for the District of Columbia.  *Id.* at ¶ 6.

10           Consistent with 28 U.S.C. § 1963, Petitioners have registered their

11   judgments in this District.  *Id.* at ¶ 7.  In cases involving judgments entered against

12   foreign sovereigns pursuant to the FSIA, judgment creditors must serve the

13   sovereign with notice of default judgments in the manner that 28 U.S.C. § 1608(a)

14   prescribes.  *See* 28 U.S.C. § 1608(e).  Petitioners completed that step years ago.

15   Bonner Decl. at ¶ 8.

### B.    Iran's Efforts to Evade U.S. Sanctions Applicable to the Smuggled Oil Aboard the Tanker Suez Rajan

18           Petitioners seek to satisfy a small portion of their Default Judgments with the

19   proceeds of the sale of approximately 1,000,000 barrels of Iranian-owned crude oil

20   aboard the Marshall Islands-flagged tanker Suez Rajan.  Bonner Decl. at ¶ 9;

21   5/13/2022 Declaration of David Adesnik [Dkt. 16-2] ("Adesnik Decl.") at ¶ 22;

22   Tr. at 95-96.  Petitioners have already demonstrated through their expert's

23   declaration and related evidence that NIOC owns the Smuggled Oil.  Adesnik Decl.

24   at ¶¶ 7-22; Bonner Decl. at ¶¶ 9-10.  Although the Examination Hearing was

25   limited to the issue of Oaktree's control, Petitioners nonetheless elicited additional

26   evidence that leaves no doubt that the Smuggled Oil belongs to Iran, as noted in the

27   transcript citations below.

28

ROVENS LAMB LLP
TRIAL LAWYERS

1   The Iranian government owns 100% of NIOC.  Request for Judicial Notice
2   [Dkt. 23] ("RJN") Ex. 4 at p. 419; *see also* RJN Ex. 5 (U.S. Department of Treasury
3   press release noting that "NIOC . . . [is] part of the Government of Iran").  Under
4   Iranian law, NIOC owns all of Iran's oil resources and transfers the proceeds from
5   its sales of oil to the Central Bank of Iran for use in financing the Iranian
6   government's budget.  RJN Ex. 4 at pp. 416-17; *see also id*., RJN Ex. 5 at p. 2 (U.S.
7   Department of Treasury press release noting that "NIOC, overseen by the [Iranian]
8   Ministry of Petroleum, is responsible for the exploration, production, refining, and
9   export of oil and petroleum products in Iran"); Adesnik Decl. at ¶ 13.
10   As Mr. Adesnik explains in his uncontested declaration, because of the
11   sanctions that the U.S. has imposed related to Iran's nuclear proliferation efforts
12   and terrorism, Iran engages in elaborate efforts to hide the provenance of its oil and
13   to sell that oil on the black market.  Adesnik Decl. at ¶¶ 4-6.  The oil aboard the
14   Suez Rajan was subject to precisely such sanctions-busting machinations.  *Id.* at
15   ¶¶ 15-22. █████████████████████████████████████████████
16   ████████████████████████████████████████████████
17   ███████████████████████████████████████████
18   █████████████████████████████████████████████████
19   ████████████████████████████████████████████████████
20   ███████[2]
21   On or about January 22, 2022, NIOC loaded the Smuggled Oil aboard the
22   Panamanian-flagged crude oil tanker Virgo at Iran's Kharg Island Terminal, a
23   destination where only Iranian oil would be located.  Adesnik Decl. at ¶¶ 13, 15;
24   Tr. at 91 (Oaktree representative Martin Graham saw satellite images showing that
25   the Virgo secured the oil it delivered to the Suez Rajan at Kharg Island in Iran);
26   Tr. at 91 (Empire Navigation did not dispute that the vessel Virgo was the ship that

27
28   [2] Citations to "Hearing Ex. __" refer to exhibits introduced into evidence at the Examination
     Hearing, copies of which are submitted herewith in the accompanying Compendium.

ROVENS LAMB LLP
TRIAL LAWYERS

1    transferred the Smuggled Oil onto the Suez Rajan).  After the Virgo left Kharg

2    Island, NIOC moved the Smuggled Oil onto the Suez Rajan by means of a ship-to-

3    ship transfer.  Adesnik Decl. at ¶¶ 7, 16-19; Tr. at 37, 90-91 (the Suez Rajan's

4    charterer Empire Navigation confirmed that there had been a ship-to-ship transfer to

5    load the oil on the Suez Rajan).  Before that transfer took place, the Virgo and the

6    Suez Rajan turned off the transponders that signal their locations.  Adesnik Decl. at

7    ¶ 18.  That illegal maneuver, which NIOC commonly employs to hide its ownership

8    of oil it sells in violation of U.S. sanctions, leaves little doubt that the Smuggled Oil

9    aboard the Suez Rajan belongs to NIOC.  Adesnik Decl. at ¶¶ 5-6, 15-22.

10        Satellite imagery further evidences NIOC's ownership of the Smuggled Oil.

11   *Id.* at ¶¶ 13, 15, 20.  After the Virgo and the Suez Rajan turned off their

12   transponders, the satellite imagery shows that the two vessels remained side-by-

13   side, a maneuver consistent with the illicit ship-to-ship transfer Petitioners allege.

14   *Id.* at ¶¶ 16-18.

15        Moreover, since this ruse became public knowledge and the subject of a U.S.

16   government investigation, the Suez Rajan has remained idled in waters near the

17   Riau Archipelago of Indonesia, rather than proceeding to her intended destination

18   of China.  RJN Ex. 12 (April 21, 2022, email by Brian P. Maloney, Esq., counsel

19   for Oaktree); Tr. at 95 (Suez Rajan has been adrift for 9 months with approximately

20   $100 million in oil and no one has claimed ownership of that oil).  If the Smuggled

21   Oil originated someplace other than Iran, it would not be occupying a tanker for

22   months-on-end during a period of high demand for oil resulting from the war in

23   Ukraine and the related sanctions upon Russian energy exports.

24        In the face of this powerful circumstantial evidence that the Smuggled Oil on

25   the Suez Rajan is Iranian, Mr. Graham testified that he does not "know" that the

26   Suez Rajan's cargo is Iranian oil but he does "have suspicions that it's Iranian oil."

27   Tr. at 97.  Even after Empire Navigation provided purported proof that the

28   Smuggled Oil was not Iranian in origin, the belated nature of that "evidence"

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

caused Mr. Graham "suspicions about the veracity of those documents." *Id.* at 37-38.  Mr. Graham conceded that Empire Navigation and the ultimate charterer of the Suez Rajan for the voyage in question (Ocean Park) "both had the opportunity and motivation to either forge these documents or to produce them through corrupt means." *Id*. at 38-39.

The Suez Rajan's cargo is worth approximately $100 million.  Bonner Decl. at ¶ 13.  *See also* Tr. at 96 (Oaktree consultant Tobias Backer "said to [Mr. Graham] there's a hundred million dollars' worth of oil on that ship").  That amount constitutes but a small fraction of the billions of dollars Iran owes Petitioners. Bonner Decl. at ¶¶ 4, 13.

**C.    Oaktree and Its Control of the Suez Rajan**

Oaktree is an investment manager incorporated under Delaware law, with its principal executive office in this District.  RJN Ex. 7 at p. 1, RJN Ex. 11 [Declaration of Oaktree Managing Director Martin Graham ("Graham Decl.")] at ¶¶ 1, 7; Hearing Ex. 17 [Compendium Tab 8] (identifying four of the six members of the "Fleetscape Team" as officers or employees of Oaktree).  Public records identify the registered owner of the Suez Rajan as Fleetscape Suez Rajan LLC. RJN Ex. 1 at p. 1, and RJN Ex. 11 (Graham Decl. at ¶¶ 2, 13).  Public documents also identify Oaktree as the "Group Beneficial Owner" of the Suez Rajan.  RJN Ex. 1.

More importantly, as demonstrated below, evidence admitted at the Examination Hearing demonstrates definitively that Oaktree, an entity headquartered in Los Angeles, is the ultimate owner of the Suez Rajan through various employee-less foreign shell companies.  Moreover, under the Bareboat Charter Agreement governing the vessel, Oaktree and its Los Angeles-based personnel have the right and ability to re-take possession of the vessel and its cargo.

Oaktree owns the Suez Rajan through foreign shell company affiliates.  Tr. at 12 ("we may own the vessel, but it is purely as collateral;" "an affiliate of Oaktree

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Capital Management is the owner of the Suez Rajan").  Consistent with that testimony, Mr. Graham acknowledged in an email that the Suez Rajan "belong[ed] to an Oaktree fund."  Hearing Ex. 45 [Compendium Tab 14] at OCM09994 (Feb. 16, 2022 email).

At the hearing, Petitioners introduced an Oaktree chart summarizing the entities in the ownership structure of the Suez Rajan.  Hearing Ex. 6 [Compendium Tab 4].  None of the Oaktree foreign shell corporation affiliates in that ownership structure have any offices or employees, and each of them was created by Los Angeles-based Oaktree employees.  Tr. at 51-53.   Moreover, Mr. Graham, testified that:  (1) he has no knowledge that there is anybody working in Oaktree's Los Angeles office who is employed by anyone else other than Oaktree (Tr. at 53); and (2) Fleetscape Suez Rajan LLC "is controlled by a Delaware entity, Oaktree GP Fund, LLC, and the only way you can get in contact with that entity is through the Oaktree Office in Los Angeles, or through us in London" where Mr. Graham works.  Tr. at 63.

Mr. Graham also acknowledged that Oaktree personnel in Los Angeles have overall responsibility for the investing activity of the fund that owns the Suez Rajan.  Tr. at 20-21; *see also* Tr. at 49-50 (the day-to-day management of the Fund that ultimately owns the Suez Rajan is conducted by Oaktree personnel in Oaktree's Los Angeles office).  Oaktree's subsidiary, Oaktree Fund GP, I, LLC, and its subsidiary provide the day-to-day direction for the Oaktree Maritime Fund that owns the Suez Rajan.  Tr. at 51.  Oaktree Fund GP, I, LLC is located in Los Angeles and when Mr. Graham wants to contact that entity he "contact[s] individuals who work in the Oaktree office in Los Angeles."  *Id*.

The Fleetscape Capital entities in the ownership structure of the Suez Rajan are also Oaktree affiliates that do not have independent management.  Rather, they are managed by a combination of Oaktree employees and Oaktree consultants. Tr.

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   at 58; Hearing Ex. 43 [Compendium Tab 12] at OCM09741; Hearing Ex. 6

2   [Compendium Tab 4].

3          Consistent with that structure, under the Bareboat Charter Agreement for the

4   Suez Rajan signed by Oaktree affiliate Fleetscape Suez Rajan, LLC, all notices to

5   Fleetscape are to be sent to Oaktree in Los Angeles.  Tr. at 60; Hearing Ex. 3

6   [Compendium Tab 5] at 1496-1497.  Similarly, pursuant to the sale agreement by

7   which Oaktree's shell-company affiliate Fleetscape Suez Rajan, LLC purchased the

8   Suez Rajan, all notices are to be sent to Oaktree in Los Angeles.  Hearing Ex. 5

9   [Compendium Tab 3] at OCM01546; Tr. at 61-62.  Moreover, Mr. Graham, a

10  managing Director of Oaktree who conceded that he answers to Oaktree senior

11  leadership in Los Angeles, signed the memorandum of agreement for the purchase

12  of the Suez Rajan as a representative of the buyer, Fleetscape Suez Rajan LLC.

13  Hearing Ex. 5 [Compendium Tab 3] at OCM01555; Tr. at 20-21, 27.

14         The manner in which Oaktree responded to the information that the Suez

15  Rajan was holding the Smuggled Oil confirms that the Los Angeles-based entity

16  controls the response to that sanctions violation and, thus, further evidences

17  Oaktree's control over the Suez Rajan.  ██████████████████████████

18  ██████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████

20  ██████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████

22  ████████████████████████████████████████  Oaktree also

23  immediately delivered instructions to Empire Navigation to refrain from delivering

24  the oil aboard the Suez Rajan to its Chinese destination, thus demonstrating

25  Oaktree's confidence in its ability to control the movements of the Suez Rajan.  Tr.

26  39; Hearing Ex. 34 [Compendium Tab 10] at OCM04288 (the substance of

27  Oaktree's message to Empire Navigation was "You are required to instruct the

28

Rovens Lamb LLP
Trial Lawyers

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  vessel to maintain its current position and discontinue any further voyage until the

2  matter is resolved").

3          Moreover, Los Angeles-based Oaktree employees controlled any public

4  statements made in response to allegations that the Suez Rajan is laden with Iranian

5  oil.  *See* Tr. at 70 (no public statement would be released on behalf of Fleetscape

6  Capital without approval from Oaktree's corporate communications team in Los

7  Angeles); Tr. at 71 (Oaktree decided what would be said publicly about the Suez

8  Rajan and decided to attribute those statements to a spokesman for Fleetscape,

9  which had no employees); Hearing Ex. 37 [Compendium Tab 11] at 4728; Tr. at

10  78-81(two Oaktree lawyers in Los Angeles ultimately signed the letter to Empire

11  Navigation reserving all rights under the Suez Rajan Bareboat Charter Agreement

12  on behalf of Fleetscape Suez Rajan and the various Oaktree affiliate shell

13  companies in the vessel's ownership chain).  Indeed, Mr. Graham told Oaktree's

14  public relations consultant Ms. Claire Keyte that, with respect to matters related to

15  the Suez Rajan, he (Mr. Graham) spoke "under [the LA Office of Oaktree

16  Capital's] control."  Tr. at 26-27.  Mr. Graham also acknowledged that Oaktree's

17  Los Angeles office would be the "final determinant" about what was said publicly

18  about the USDHS's allegations of Iranian Oil aboard the Suez Rajan.  Tr. at 28-29;

19  Hearing Ex. 44.

20          The terms of the Bareboat Charter also make clear that Oaktree maintains the

21  power to reclaim the Suez Rajan from Empire Navigation and its affiliate, Suez

22  Rajan Limited.  As Mr. Graham testified at the Examination Hearing, Suez Rajan,

23  Limited, an affiliate of Empire Navigation, chartered the Suez Rajan pursuant to the

24  Bareboat Charter.  Tr. at 29-30; Hearing Ex. 3 [Compendium at Tab 2].  Mr.

25  Graham also acknowledged at the Examination Hearing that carrying the Smuggled

26  Oil aboard the Suez Rajan violates the Bareboat Charter.  Tr. at 32.  *See also*

27  Hearing Ex. 34 [Compendium at Tab 10] at OCM04288; Hearing Ex. 2

28

ROVENS LAMB LLP
TRIAL LAWYERS

ROVENS LAMB LLP
TRIAL LAWYERS

1  [Compendium at Tab 15] at OCM01331 (Oaktree's citation to relevant sanctions

2  provision of Bareboat Charter Agreement).

3      Moreover, the Bareboat Charter explicitly authorizes Oaktree's affiliate to

4  terminate the agreement and reclaim the Suez Rajan if Suez Rajan Limited permits

5  the vessel to transport Iranian oil.  Tr. at 32; Hearing Ex. 3 [Compendium Tab 2] at

6  OCM01352 (defining the "Charter Period" as five years absent violations of,

7  among other terms, the lease's "Sanctions" provisions).  Upon termination,

8  Oaktree's shell company affiliate, Fleetscape Suez Rajan LLC, which Oaktree

9  controls, would retake possession of the vessel.  Hearing Ex. 3 at OCM01413-14,

10  Clause 44.2 (entitling Oaktree's subsidiary to terminate the Bareboat Charter

11  Agreement if the Suez Rajan is operated in violation of U.S. "Sanctions").

12      Moreover, although Oaktree denies that it has control over the Suez Rajan,

13  Mr. Graham conceded that Oaktree personnel in Los Angeles have the requisite

14  signing authority to terminate the Bareboat Charter and to execute the

15  documentation necessary to do so "without any input from [Mr. Graham]."  Tr. at

16  23.  Consistent with that testimony, Mr. Graham acknowledged that if Oaktree's

17  CEO decided to terminate the Bareboat Charter Agreement for the Suez Rajan,

18  there is not "anyone who is in a position to tell him that they're not going to follow

19  his directions."  Tr. 23-24.

20  █████████████████████████████████████

21  ███████████████████████████████████████

22  ██████████████████████████████████████

23  ██████████████████████████████████████

24  ███████████████████████████████████████

25  ████████████████████████████████████████

26  ███████████████████████████████

27  ██████████████████████████████████████

28  ████████

As a result, no fair question exists regarding Oaktree's ability to control the Suez Rajan.  It appears, however, that Oaktree lacks the will to take the steps within its power to reclaim the vessel.  ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████  Because the case law authorizes the Court to order the steps necessary to facilitate Petitioners' ability to collect their long-outstanding judgments, the Court should put an end to Oaktree's profiteering and require it to terminate the Bareboat Charter.

## I.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER THESE POST-JUDGMENT PROCEEDINGS

Federal district courts have subject matter jurisdiction to conduct post-judgment proceedings related to the enforcement of money judgments entered pursuant to the FSIA's terrorism exception to foreign state immunity.  *See Peterson v. Islamic Republic of Iran* (9th Cir. 2010) 627 F.3d 1117, 1122-23. Petitioners have registered their judgments in this District pursuant to 28 U.S.C. § 1963.  Bonner Decl. at ¶ 7.  Accordingly, the Court may enforce those judgments to the same extent as judgments the Court initially issued itself.  *See, e.g., Peterson*, 627 F.3d at 1123 ("When a final judgment from one district is registered with another district court pursuant to § 1963, the registered judgment must be treated like any other judgment entered by the registering court."); *Rubin v. Islamic Republic of Iran* (D. Mass. Sept. 30, 2006) 2006 U.S. Dist. LEXIS 73383, at *1 ("This Court acquired jurisdiction over the present controversy [to attach assets belonging to Iran] when the plaintiffs registered here the judgment they had obtained against Iran in the United States District Court for the District of Columbia.").

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## II. FEDERAL RULE OF CIVIL PROCEDURE 69 PERMITS JUDGMENT CREDITORS TO RELY ON FEDERAL LAW AND STATE (CALIFORNIA) LAW PROCEDURAL MECHANISMS TO FACILITATE THEIR COLLECTION EFFORTS

Under Fed. R. Civ. P. 69, in federal court, "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise."  Rule 69 further dictates that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Under Rule 69, Petitioners may therefore rely upon the full array of enforcement mechanisms available under federal and California law to facilitate their ability to use the Smuggled Oil to satisfy a portion of their Default Judgments.  *See, e.g., Peacock v. Thomas* (1996) 516 U.S. 349, 356 (emphasizing that a federal court has the "inherent power to enforce its judgments" and that it may exercise that power in connection with "supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments – including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances").

## III. THE COURT SHOULD EXERCISE ITS AMPLE STATUTORY AND EQUITABLE POWERS TO FACILITATE PETITIONERS' ABILITY TO EXECUTE THEIR DEFAULT JUDGMENTS AGAINST THE SMUGGLED OIL

### A. The Court May Exercise Its Full Array of Equitable Powers in Connection with the Examination Hearing

In conjunction with Cal. Civ. Pro. Code Section 708.120 examination proceedings, California state and federal courts can employ a number of judicial powers and procedural mechanisms to facilitate judgment creditors' ability to collect judgment debtor assets controlled by third parties.  For example, "the court or referee may order the person examined, be it the judgment debtor or a third person, to deliver property or funds to a levying officer or directly to the judgment creditor." *Imperial Bank v. Pim Elec. Inc.* (1955) 33 Cal. App. 4th 540, 547 (citing

Cal. Civ. Proc. Code § 708.205, Cal. Law Revision Comm. Comment).  As *Imperial Bank* explains, the court may also facilitate collection by, among other steps, appointing a receiver or directing "that execution be issued to collect the sum due." *Id.* (also citing Cal. Civ. Proc. Code § 708.205, Cal. Law Revision Comm. Comment); *see also, id.* at 550 ("'A judgment creditor may also obtain a turnover order in aid of execution.'") (quoting Alan M. Ahart, *Cal. Practice Guide: Enforcing Judgments & Debts* 2 (The Rutter Group 1994), P 6:1338.1, p. 6G-16.1.); Cal. Civ. Proc. Code § 708.620 ("The court may appoint a receiver to enforce the judgment where the judgment creditor shows that, considering the interests of both the judgment creditor and the judgment debtor, the appointment of a receiver is a reasonable method to obtain the fair and orderly satisfaction of the judgment."); Cal. Civ. Proc. Code § 708.120, Legislative Committee Comment ("The court may also determine in the examination proceedings that the property sought to be reached may properly be applied to the satisfaction of the judgment through an order in examination proceedings.").

### B.   TRIA and the FSIA Dictate that the Smuggled Oil Enjoys No Immunity from Execution

Under the FSIA assets of foreign sovereigns and their agencies and instrumentalities located in the United States remain exempt from execution *unless* a statutory exemption applies to those assets.  *See* 28 U.S.C. § 1609 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act … the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.").  However, the FSIA does *not* immunize a foreign sovereign's assets located *outside* the U.S.—including the Smuggled Oil—from collection proceedings in the U.S.

In that regard, the U.S. Supreme Court held in *Republic of Arg. v. NML Capital, Ltd.* (2014) 573 U.S. 134 that the "*comprehensive*" FSIA "'indisputably

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

governs the determination of whether a foreign state is entitled to sovereign immunity.'" *Id.* at 141 (emphasis in original) (quoting *Samantar v. Yousuf* (2010) 560 U.S. 305, 313). As a result, "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *Id.* at 141-42. The *NML* Court further held that "[t]he text of [28 U.S.C. § 1609] immunizes only foreign-state property '*in the United States*,'" and even that immunity to execution is subject to various exceptions. *Id.* at 144 (emphasis in original). Thus, *NML* forecloses any suggestion that the FSIA prevents Petitioners from collecting the Smuggled Oil aboard the Suez Rajan, which is currently idled in international waters off the coast of Indonesia.

Moreover, TRIA – upon which Petitioners rely – provides a comprehensive exception to the FSIA's default rule immunizing foreign sovereign's assets "in the United States." TRIA provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA, § 201(a) (codified at 28 U.S.C. § 1610 (note)).[3]

---

[3] Most judgments against foreign sovereigns and their agencies and instrumentalities may only be enforced after a court issues an order pursuant to 28 U.S.C. § 1610(c) finding that an adequate amount of time has passed without the satisfaction of the judgment to allow enforcement proceedings to commence. However, judgments enforced pursuant to TRIA— which Congress adopted explicitly to facilitate the collection of judgments against state sponsors of terrorism like Iran—are not subject to that requirement, which applies only to any "attachment or execution referred to in subsections (a) and (b) of [§ 1610]." Congress did not codify TRIA as part of § 1610(a) or (b). Rather, TRIA is a standalone provision codified in a note to § 1610. *See, e.g., Stansell*, *supra*, 771 F.3d at 730 (§ 1610(c) is inapplicable to collection efforts undertaken pursuant to TRIA); *but see Levin v. Bank of N.Y.* (S.D.N.Y.

ROVENS LAMB LLP
TRIAL LAWYERS

1    As courts have recognized, "notwithstanding" provisions like the one TRIA

2  features eliminate all obstacles to statutes' enforcement, whether statutory or

3  common law.  *See, e.g., Cisneros v. Alpine Ridge Grp.* (1993) 508 U.S. 10, 18

4  ("[T]he Courts of Appeals generally have interpreted similar notwithstanding

5  language . . . to supersede all other laws, stating that [a] clearer statement is

6  difficult to imagine.") (internal quotations and citation omitted).  Thus,

7  impediments to collection extraneous to TRIA—whether they arise under the

8  FSIA or another provision of state or federal law—cannot prevent collection

9  where judgment creditors demonstrate that they satisfy all of TRIA's

10 requirements.  As explained at Point III.C below, Petitioners satisfy all of TRIA's

11 requirements with respect to the Smuggled Oil because that contraband is "the

12 blocked asset of [Iran's] … instrumentality" NIOC.

13    Moreover, the fact that Oaktree does not currently have possession of the

14 Suez Rajan poses no obstacle to the relief Petitioners seek.  The New York Court

15 of Appeals' decision in *Commonwealth of the N. Mariana Islands v. Canadian*

16 *Imperial Bank of Commerce* (N.Y. 2013) 990 N.E. 2d 114, is instructive.  *N.*

17 *Mariana Islands* held that the New York courts lacked the power to order a parent

18 banking institution to turnover assets its foreign subsidiary held for the judgment

19 debtor.  The court reasoned that, unlike California's Section 708.120, the New

20 York law authorized a court to order turnover only where a third party had actual

21 possession or custody of the judgment debtor's property.  *Id.* at 117.  Critically,

22 that ruling hinged on the specific language of the applicable New York collection

23 statute, which dictated that courts could compel turnover only when a third party

24

25  Jan. 28, 2011) 2011 U.S. Dist. LEXIS 8946, at *43-45 (in a proceeding seeking turnover of
   Iranian assets pursuant to TRIA, writs of execution served without first obtaining a § 1610(c)
26  order were invalid).  Thus, consistent with *Stansell*, the Court's order denying Petitioners' *ex*
   *parte* application for a § 1610(c) order does not present any obstacle to enforcement of
27  Petitioners' Default Judgments pursuant to TRIA.  *See also* Dkt. 5-1 at p.5 (noting that
   Petitioners' request for a § 1610(c) order was made "out of an abundance of caution").
28

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   itself was in "'possession or custody'" of the judgment debtor's assets.  *See id.*

2   (quoting N.Y. CPLR § 5225(b)).

3         The *N. Mariana Islands* Court emphasized that "[t]he plain language of

4   section 5225(b) refers only to 'possession or custody,' excluding any reference to

5   'control.'"  *Id.*  As a result, the court held that it could not order the parent entity

6   to compel its subsidiary to turnover the relevant assets because "the omission of

7   'control' from section 5225(b)" demonstrated the legislature's determination that

8   "'possession or custody' requires actual possession."  *Id.*  The court therefore

9   concluded that it could not order the parent to turnover the relevant assets, even if

10  the parent possessed the practical ability to control the actions of its subsidiary.

11  *Id.* at 119 ("Consequently, because 'possession, custody or control' has been

12  construed to encompass constructive possession, then, by contrast, legislative use

13  of the phrase 'possession or custody' contemplates actual possession.").

14        In contrast to New York's CPLR § 5225(b), California's legislature has

15  authorized courts to conduct examination proceedings when "a third person has

16  possession ***or control*** of property in which the judgment debtor has an interest."

17  Cal. Civ. Proc. Code § 708.120(a) (emphasis added).  The Code of Civil

18  Procedure further empowers a court to order relief designed to facilitate the

19  collection of judgments "at the conclusion of" an examination hearing where the

20  court determines that a judgment debtor's property is "in the possession ***or under***

21  ***the control*** of" a "third person."  Cal. Civ. Proc. Code § 708.205(a) (emphasis

22  added).  Thus, the wording of the California statute dictates that—in contrast to

23  New York law—a third party's control over the movement of an asset suffices to

24  permit a California court to order steps designed to facilitate collection of that

25  property.

26        Cases arising in other contexts bolster the conclusion that, to demonstrate

27  Oaktree's "control" over the Suez Rajan and its cargo, Petitioners need only

28  demonstrate that Oaktree has the practical ability to direct the actions of its

ROVENS LAMB LLP
TRIAL LAWYERS

ROVENS LAMB LLP
TRIAL LAWYERS

1   subsidiaries.  For example, in *United States v. Int'l Union of Petrol. & Indus.*

2   *Workers* (9th Cir. 1989) 870 F.2d 1450, the court addressed the scope of Fed. R.

3   Civ. P. 34(a), which permits discovery of documents in the "'possession, custody

4   *or control*'" of the recipient of a document request or subpoena.  *Id.* at 1452

5   (quoting Fed. R. Civ. P. 34(a) (emphasis added)).  The court concluded that

6   Rule 34(a)'s "control" language dictates that "[a] corporation must produce

7   documents possessed by a subsidiary that the parent corporation owns or wholly

8   controls."  *Id.*

9       Similarly, in *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic*

10  *of Venez.* (D.D.C. 2016) 185 F. Supp. 3d 233, the court addressed the plaintiffs'

11  entitlement to discovery relevant to whether oil rigs expropriated pursuant to

12  Venezuelan statutes were "'owned or operated by an agency or instrumentality

13  of'" Venezuela.  *Id.* at 237 (quoting 28 U.S.C. § 1605(a)(3)).  The court held that

14  the plaintiffs could demonstrate that Venezuelan agencies "owned or operated" the

15  Plaintiffs' rigs by proving the agencies' "power, influence, or practical control

16  over the rigs as manifested through their control of their respective wholly owned

17  subsidiaries."  *Id.* at 244.

18     **C.**   **At the Examination Hearing Petitioners Demonstrated**
19            **that They Satisfy All of TRIA's Requirements for Executing**
               **Against the Proceeds of the Smuggled Oil**

20        **1.**  *The Elements Petitioners Must Prove to Show Their*
21             *Entitlement to Collect the Smuggled Oil Under TRIA*

22       In *Weininger v. Castro* (S.D.N.Y. 2006) 462 F. Supp. 2d 457, 479, the court

23  held that judgment creditors must prove the following elements to execute against

24  sovereign assets pursuant to TRIA:

25       (1) [they have] obtained a judgment against a terrorist party;

26       (2) the judgment is either (a) for a claim based on an act of terrorism,

27       or (b) for a claim for which a terrorist party is not immune under 28

28       U.S.C. § 1605A (or former 28 U.S.C. § 1605(a)(7));

(3) the assets are "blocked assets" within the meaning of TRIA; and

(4) the execution is sought only to the extent of any compensatory damages [; and

(5)] the blocked assets … are those of either the "terrorist party" or "any agency or instrumentality of that terrorist party," even though the judgment itself need be only against the terrorist party.

Through the testimony and documentary evidence introduced at the Examination Hearing along with the evidence previously submitted to this Court, Petitioners have established all those elements, most of which are incontestable.

### 2. *Petitioners Hold Judgments Against Iran, a Terrorist Party*

TRIA defines the term "terrorist party" to include "a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 ([50 U.S.C. § 4604]) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." TRIA § 201(d)(4). Petitioners hold judgments against Iran, which has been designated as a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act of 1979 since January 19, 1984. *See Bennett v. Islamic Republic of Iran* (9th Cir. 2015) 817 F.3d 1131, 1137; RJN Ex. 10.

### 3. *Petitioners' Judgments Arise from Claims for Which Iran Has No Immunity from Liability*

Petitioners secured terrorism-related judgments under 28 U.S.C. § 1605A or its predecessor, § 1605(a)(7). Bonner Decl. at ¶ 5. Those statutes provide exceptions to the default rule that sovereigns are immune from liability in U.S. courts. *See* 28 U.S.C. § 1605A; 28 U.S.C. § 1605(a)(7) (repealed and replaced by § 1605A); Bonner Decl. at ¶¶ 5-6. TRIA applies equally with respect to both statutes. *See* TRIA § 201(a).

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

### 4. *Petitioners' Uncollected Compensatory Damages Far Exceed the Value of the Smuggled Oil*

As noted above, Petitioners hold billions of dollars of uncollected compensatory damages judgments against Iran. *See* Bonner Decl. at ¶ 4. The value of the Suez Rajan's cargo is far smaller—roughly $100 million at the market prices prevailing on May 13, 2022. *Id.* at ¶¶ 12-13; RJN Exs. 2, 3, 15 and 16.

### 5. *The Smuggled Oil is a Blocked Asset of NIOC, Which Qualifies as an Agency or Instrumentality of Iran Under TRIA*

The Smuggled Oil also qualifies as a "blocked asset of" NIOC that is subject to execution under TRIA because NIOC is an "agency or instrumentality" of Iran. *See* TRIA § 201(a). The FSIA defines an "agency or instrumentality of a foreign state" to include:

> any entity (1) which is a separate legal person, corporate or otherwise, and (2) … a majority of whose shares or other ownership interest is owned by [the] foreign state or a political subdivision thereof, and (3) which is neither a citizen of a State of the United States … nor created under the laws of any third country.

28 U.S.C. § 1603(b). The Iranian government owns 100% of NIOC. *See* RJN Ex. 4 at 419 and RJN Ex. 6. Thus, NIOC is unquestionably an agency or instrumentality of Iran. *See, e.g., Estate of Hardwick v. Islamic Republic of Iran* (D.D.C. Oct. 1, 2021) 2021 U.S. Dist. LEXIS 252934, at *26 ("NIOC constitutes an 'agency or instrumentality' of Iran.").

TRIA defines the term "blocked asset" to mean "any asset seized or frozen by the United States under section 5(b) of the Trading with the Enemy Act ([50 U.S.C. § 4305(b)]) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702) ("IEEPA")." TRIA § 201(d)(2)(A). Effective February 6, 2012, President Obama exercised powers he possessed under IEEPA to block "[a]ll property and interests in property of the Government of Iran … that are in the United States, that hereafter come within the

United States, or that are or hereafter come within the possession or control of any United States person…."  RJN Ex. 9 (Executive Order 13599—*Blocking Property of the Government of Iran and Iranian Financial Institutions*) at §§ 1(a) and 7(d) ("EO-13599").

EO-13599 defines the "Government of Iran" to include "any political subdivision, agency, or instrumentality thereof."  EO-13599 at § 7(d).  Thus, if a "United States person" has "control" over property that belongs to NIOC—such as the Smuggled Oil—TRIA subjects that property to execution.

As demonstrated above (*see* pp 6-8), Petitioners have already demonstrated by a preponderance of the evidence that it is more likely than not that the Smuggled Oil aboard the Suez Rajan belongs to NIOC and thus constitutes a "blocked asset" of Iran.[4]  Moreover, for purposes of EO-13599, a United States person includes any "entity organized under the laws of the United States or any jurisdiction within the United States."  EO-13599 at § 7(c) (RJN Ex. 9).  Oaktree—which is organized under Delaware law and headquartered in this District (RJN Ex. 7)—undeniably qualifies as a "United States person."

Moreover, Oaktree "controls" the Smuggled Oil because it controls the Suez Rajan, which currently houses that cargo.  Petitioners have demonstrated that Oaktree is the ultimate owner of the Suez Rajan through various foreign shell companies; and under the Bareboat Charter Agreement governing the vessel, Oaktree has the right and ability to re-take possession of the vessel and its cargo. *See supra* at pp. 8-13.

Oaktree's ability to control the Suez Rajan is reinforced by the fact that, since Oaktree's connection to the vessel became public, the tanker has not proceeded to its intended destination in China.  *See* p. 7, *supra*; Tr. at 95 (Suez Rajan has been adrift for 9 months with approximately $100 million in oil and no

---

[4] If the Court has any reservations about making such a finding, Petitioners request further discovery and a hearing on that matter.  As Petitioners note above, the Court limited the Examination Hearing solely to questions concerning Oaktree's control of the Suez Rajan.

1  one has claimed ownership of that oil); RJN Ex. 12.  If an entity lacking

2  connection to the U.S. actually controlled the vessel, it would have delivered its

3  illicit cargo to China months ago.

4      Thus, the Smuggled Oil aboard the Suez Rajan is the property of an

5  instrumentality of Iran, which is a U.S. government-designated state sponsor of

6  terrorism.  Moreover, Oaktree—a "United States person"—controls that oil by

7  means of the control it exerts over the Suez Rajan.  Petitioners have therefore

8  demonstrated that—pursuant to TRIA § 201(a)—the Smuggled Oil aboard the

9  Suez Rajan is subject to execution to satisfy Petitioners' judgments.

10  **D.   The Presence of the Smuggled Oil in International
11        Waters Does Not Prevent the Court from Ordering
          Oaktree to Take the Steps Necessary to Facilitate
12        Petitioners' Ability to Execute Against Those Assets**

13      While, as the Court observed in its April 8, 2022 Order [Dkt. 12], the

14  Smuggled Oil itself currently is outside the Court's jurisdiction, the Court

15  maintains ample power to order Oaktree—a party subject to the Court's

16  jurisdiction—to take the steps necessary to facilitate Petitioners' ability to execute

17  against those assets.  While courts often enforce judgments by exercising *in rem*

18  powers over property, they can also facilitate collection by directing the actions of

19  entities subject to the courts' *in personam* jurisdiction.  *See, e.g., Taylor v. Taylor*

20  (1923) 192 Cal. 71, 76 ("By means of its power over the person of the parties

21  before it, a court of equity may in proper cases compel them to act in relation to

22  property not within the jurisdiction, but its decrees do not operate directly upon

23  the property nor affect the title.  They are only made effectual through the

24  coercion of the parties, by directing some action on their part, such as the

25  execution of conveyances or the cancellation of instruments."); *accord, e.g.,* Alan

26  M. Ahart, *Cal. Practice Guide: Enforcing Judgments & Debts*, Ch. 6J-3 (June

27  2021 Update) ("Ahart Practice Guide") ("However, so long as it has personal

28  jurisdiction over the judgment debtor, a California court may order the judgment

ROVENS LAMB LLP
TRIAL LAWYERS

ROVENS LAMB LLP
TRIAL LAWYERS

1   debtor to apply out-of-state property to satisfy a California judgment."); *see also,*

2   *e.g., Brown v. Brown* (1971) 22 Cal. App. 3d 82, 84 ("Every court has power to

3   compel obedience to its judgments and orders …, and a court of equity retains

4   inherent jurisdiction to oversee and enforce execution of its decrees.").

5          The power to facilitate the collection of out-of-jurisdiction property by

6   issuing orders to entities subject to courts' personal jurisdiction extends to

7   garnishees and other third parties that possess judgment debtors' property.  *See,*

8   *e.g.,* Ahart Practice Guide at 6:1849.4 ("The examinee may be ordered to deliver

9   out-of-state nonexempt property or funds directly to the judgment creditor, to the

10  levying officer or to a receiver (if one has been appointed).").  The New York

11  Court of Appeals' decision in *Koehler v. Bank of Bermuda Ltd.*, (N.Y. 2009) 883

12  N.Y.S.2d 763 illustrates this principle.  There, the court ordered a bank garnishee

13  to turn over to a judgment creditor stock certificates belonging to the judgment

14  debtor that the bank was holding in Bermuda.  *See id.* at 769 ("In short, the

15  principle that a New York court may issue a judgment ordering the turnover of

16  out-of-state assets is not limited to judgment debtors, but applies equally to

17  garnishees."); *accord, e.g., JW Oilfield Equip., LLC v. Commerzbank AG*

18  (S.D.N.Y. 2011) 764 F. Supp. 2d 587, 591-93 (court may order German bank over

19  which it has personal jurisdiction "to turn over funds up to the amount of the

20  judgment, regardless of whether those accounts are held in Germany or New

21  York").[5]  In various contexts, the California courts have applied the same

22  principle.  *See, e.g., Glob. Money Mgmt. v. McDonnold* (S.D. Cal. Oct. 15, 2009)

23  2009 U.S. Dist. LEXIS 96067, at *7 ("Additionally, the Court may require a

24

25  [5] *Accord, e.g., Aequitas Enters., LLC v. Interstate Inv. Grp., LLC* (Utah 2011) 267 P.3d 923,
    930 (where court has personal jurisdiction over defendant, it can order the defendant to take
26  actions with respect to property outside of the court's jurisdiction to protect the plaintiff's
    interests); *Groza-Vance v. Vance* (Ohio Ct. App. 2005) 834 N.E.2d 15, 24  (a court has
27  jurisdiction to enter an order "against the persons over whom it has personal jurisdiction, which
    indirectly affects title to property").
28

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

judgment debtor subject to personal jurisdiction of the Court to assign his rights to payment to a judgment creditor, even if the assignable property is located outside of California."); *UMG Recordings, Inc. v. BCD Music Grp., Inc.* (C.D. Cal. Jul. 9, 2009) 2009 U.S. Dist. LEXIS 97017, at \*12-13 ("Because there is no dispute that the Court has jurisdiction over BCD in the present matter, the Court thus has 'the power to indirectly affect out-of-state property by means of a decree, based on personal jurisdiction over the parties, which determines the parties' personal rights or equities in that property.' … Accordingly, the Court may properly order BCD to assign its rights to payment from out-of-state third parties.") (citation omitted).

Moreover, before TRIA's enactment in 2002, the United States had repeatedly asserted its authority to block assets of foreign sovereigns located outside the United States that were "within the possession *or control* of United States persons," including assets within the possession or control of "foreign branches" of U.S. corporations or under the control of "any [individual or entity] in the United States."  *See, e.g.*, Executive Order 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) at §§ 1, 3(a) and (c) (emphasis added).[6]  Accordingly, when Congress authorized execution against assets blocked "***by*** the United States" in TRIA, it demonstrated the intent to permit execution against all assets the government could block, including those located outside the United States but in the possession or control of a United States person.  *See, e.g., Goodyear Atomic Corp. v. Miller* (1988) 486 U.S. 174, 184-85 ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."); *see also, e.g., Levin v. Bank of N.Y.* (S.D.N.Y. Oct. 3, 2019) 2019 U.S. Dist. LEXIS 237101, at \*42 (TRIA "establishes a separate exception to execution immunity" that "does not impose a requirement that the property in question be 'in

ROVENS LAMB LLP
TRIAL LAWYERS

---

[6]  *See also* 31 C.F.R. § 501.603(a)(2) (imposing primary responsibility for reporting blocked assets to OFAC on, *inter alia*, a "person exercising control over property located outside the United States") (promulgated in 1997, 62 FED. REG. 45098).

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   the United States'"").  Thus, the Court may order Oaktree—a third party

2   undeniably subject to the Court's jurisdiction—to undertake various actions with

3   respect to the Suez Rajan and its smuggled cargo to facilitate Petitioners' ability to

4   collect that asset.  *See, e.g., Koehler*, *supra,* 883 N.Y.S.2d at 769; *Miller v.*

5   *Doniger* (N.Y. App. Div. 2006) 814 N.Y.S.2d 141, 141 (affirming order requiring

6   judgment debtor to turn over specified out-of-state bank accounts to the New York

7   sheriff to facilitate collection efforts).  Consistent with the foregoing authority,

8   here Petitioners seek an order compelling Oaktree to exercise its right to terminate

9   the Bareboat Charter with Empire Navigation, retake possession of the Suez Rajan

10  and its Iranian oil cargo and deliver that cargo to this District where Petitioners

11  may execute against it.

12       Mr. Graham offered inadmissible hearsay testimony at the hearing ▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see e.g., Branch v Umphenour*

17  (E.D. Cal. Jan. 18, 2017) 2017 US Dist LEXIS 7032, at *10 (out-of-

18  court statements offered for the truth of the matter asserted are

19  inadmissible hearsay); Fed. R. Evid. 801(c) (hearsay); *see also Ramirez v*

20  *Manpower, Inc.* (N.D. Cal. July 10, 2014) 2014 US Dist LEXIS 94362, at *15-17

21  (plaintiffs' attorney's declaration explaining plaintiff's failure to act is

22  inadmissible because attorney did not lay a foundation for any personal

23  knowledge as to plaintiffs' state of mind); Fed. R. Evid. 602 (lack of foundation).

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████

4          Mr. Graham also testified that "as things stand today, we have felt that our

5 legal grounds to serve such a notice of termination [of the Bareboat Charter

6 Agreement] are not fully made out, and we are not certain that they would stand

7 up in a court of law…. [T]here's very good arguments, but it's far from

8 completely proven." Tr. at 106-107.  According to Mr. Graham, *if* Empire

9 Navigation were to dispute termination, the matter would by agreement be

10 litigated before the High Court in England and could take two years to resolve.

11 Tr. 107.  Mr. Graham's speculation of a possible termination dispute and a

12 possible two-year timeframe to resolve that dispute is unsupported by any

13 admissible evidence. ████████████████████████████████

14 █████████████████████████████████████████████

15 █████████████████████████████████████████████

16 ████████████████████████████  According to Mr. Graham, Oaktree

17 "would want to take action quickly" to reclaim the vessel because it is only a six-

18 day sail from the Suez Rajan's current location to its original destination in China.

19 Tr. at 108-109.

20          Mr. Graham's speculation regarding the purported risk associated with

21 prevailing in an action related to Empire Navigation's violation of the Bareboat

22 Charter Agreement lacks credibility.  Everyone, including Oaktree, knows full

23 well that the Smuggled Oil is of Iranian origin.  Otherwise, some entity that is not

24 subject to U.S. sanctions would have stepped forward long ago to claim its $100

25 million asset.  The Bareboat Charter Agreement contains explicit terms

26 authorizing termination if Empire Navigation permits the Suez Rajan to be used in

27 a manner that violates OFAC sanction regulations.  *See* p. 12, *supra.* ████████

28 ████████████████████████████████████████████████

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1 ███████████████████████████████████████████████████

2 █████████████████████████████████████████

3       Moreover, Oaktree's preferences should play no role in deciding the

4 appropriate outcome of this proceeding.  Oaktree is no innocent party.  For nine

5 months, it has been collecting lucre related to Iran's efforts to evade U.S.

6 sanctions and Petitioners' long-outstanding judgments.  Petitioners, who include

7 the representatives of U.S. peacekeepers and teenagers murdered by Iran, are the

8 innocent parties here.  The Court should therefore exercise its substantial powers

9 to order the relief Petitioners seek so that they may obtain some justice for Iran's

10 callous, decades-long sponsorship of terrorism.

11       Moreover, if the U.S. government wishes to prevent the relief Petitioners

12 seek, it can intervene in this action to advance its position. ████████████

13 ████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████

16 █████

17                        **CONCLUSION**

18       For the foregoing reasons, Petitioners respectfully request that the Court

19 order Oaktree forthwith to exercise its right to terminate the Bareboat Charter

20 Agreement with Empire Navigation, retake possession of the Suez Rajan and its

21 Iranian oil cargo, deliver that cargo to this District where Petitioners may execute

22 against it, and keep the Court and Petitioner's informed regarding what steps are

23 taken to comply with the Court's order.

24

25

26

27

28

ROVENS LAMB LLP
TRIAL LAWYERS

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  Dated:  December 19, 2022

2

Respectfully submitted,
Douglas J. Rovens
ROVENS LAMB LLP

3

4

James P. Bonner
Patrick L. Rocco

5

Susan M. Davies
FLEISCHMAN BONNER & ROCCO LLP

6

7

By:   /s/ James P. Bonner

8

*Attorneys for Petitioners*
*Emma Jean Anderson, et al.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ROVENS LAMB LLP**
**TRIAL LAWYERS**

---

PETITIONERS' POST-HEARING MEMORANDUM OF POINTS AND AUTHORITIES